**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 08-cv-01740-CMA

CHRISTOPHER WEEDMAN,

        Petitioner,

v.

WARDEN STEVE HARTLEY, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

        Respondents.

---

## ORDER ON PETITION FOR HABEAS CORPUS

---

This matter is before the Court on the Petition Under 28 U.S.C. § 2254 For Writ

of Habeas Corpus ("Petition") (Doc. # 4) filed by *pro se* Petitioner Christopher

Weedman.  Respondents answered the Petition (Doc. # 27), and Petitioner filed a

Traverse (Doc. # 31).  After reviewing the pertinent portions of the record in this case

including the Petition, the Answer, the Traverse, and the state court record, the Court

concludes that the Petition should be denied.

**I.**      **Background**[1]

Petitioner was seventeen years old when he was charged with the murder of a

fourteen-year old girl.  On the morning of October 31, 1996, a teacher arriving at

DuPont Elementary School in Commerce City, Colorado, discovered the victim's body

in a secluded courtyard on school grounds.  Investigators interviewing people living near

---

[1] This general introductory background is taken from the Statement of the Facts in
Petitioner's opening brief on direct appeal (Doc. # 17-1, Ex. K at pp. 4-12).

the school learned that neighbors heard screaming and other noises at different times during the previous night.  Investigators also learned that the victim had been with four juvenile males the previous evening, including James Huff, Danny Lake, Robert Atkinson, and Petitioner.  All four juvenile males lived within walking distance of the school.

James Huff was interviewed immediately and told investigators he had seen the victim on the afternoon of October 30 sitting on the front porch of the home where Petitioner lived with his grandparents.  James Huff also stated that he had invited the victim to party at the home of Danny Lake.  At Danny Lake's home, the three juveniles, including the victim, drank a liter of vodka.  Robert Atkinson arrived later and invited the others to his residence, where the victim continued to drink while the boys smoked marijuana.  All three boys had consensual sex with the victim.

At approximately 10:00 p.m., Robert Atkinson's grandfather told everyone to leave.  James Huff said that he went home and went to bed.  However, because the victim was enamored with James Huff and did not want to spend the night at Petitioner's house, the victim and James Huff agreed that she would go to James Huff's residence at 1:00 a.m. and he would sneak her in.

Robert Atkinson testified that he met the victim for the first time on October 30 at Danny Lake's house.  He also testified that the group continued drinking at his house and that the boys had group sex with the victim, who was intoxicated and having trouble walking.  Robert Atkinson knew the victim was a runaway who was going to spend the night at Petitioner's house.  Robert Atkinson also testified that he sent Danny Lake and the victim to Petitioner's house around 10:00 p.m. and that he did not leave his home

that evening because he was under a court-ordered curfew that included wearing an ankle bracelet.

Danny Lake lived next door to Petitioner and had known him for two years. Danny Lake testified that he met James Huff and the victim at his house on the evening of October 30 and that the group drank a pint of vodka. He also testified that all three boys later had sex with the victim at Robert Atkinson's house. According to Danny Lake, he planned to walk the victim to Petitioner's house because she was going to spend the night there and needed help walking. When they arrived at Petitioner's house, they joined Petitioner and another juvenile female in the outdoor hot tub and the victim continued drinking. Danny Lake testified that Petitioner was kind of upset when informed by Danny Lake that he and the other two boys had had sex with the victim that evening. Danny Lake claimed that he left after forty minutes and arrived home at exactly 10:47 p.m.

After returning home, Danny Lake said that he went to his bedroom and stayed awake for approximately three hours. At about 1:00 a.m., Petitioner knocked on his window and told him that the victim was drunk and wanted to go to James Huff's house. Danny Lake testified that he saw the victim through the window, that she was very intoxicated, and that Petitioner appeared to be trying to help her.

According to all three boys, Petitioner contacted them on October 30 and 31. James Huff said that Petitioner left two telephone messages between 12:30 and 1:00 a.m. on October 31 saying that the victim was very drunk and, in the later call, that she had left his house. James Huff returned the calls the next day after learning a body had been discovered at the school. During that call, Petitioner told James Huff that the

3

victim had been at his house the previous evening, but that he left to meet Aaron Duran and that the victim was gone when he returned. Petitioner also said that he looked for the victim but did not go to the school.

Although the police did not arrive at the school until 7:36 a.m., James Huff testified that he went to Danny Lake's house sometime between 7:00 and 7:30 a.m to talk about the situation at hand and that Petitioner was there when he arrived. James Huff also testified on redirect that, in a telephone conversation that preceded the discovery of the victim's body, Petitioner told him the body was the victim's.

Robert Atkinson testified that he spoke to Petitioner three times, the first being approximately 11:30 p.m. on October 30. He also testified that Petitioner asked if he had slept with the victim, who Petitioner described as his girlfriend, and that Petitioner did not appear to be upset when Robert Atkinson admitted he had. Instead, Petitioner asked if he and the victim could come to Robert Atkinson's house with more beer. Robert Atkinson later called Petitioner at midnight and spoke with the victim and Petitioner, who said he was waiting for Aaron to come over. During the midnight conversation, Robert Atkinson also heard Petitioner tell the victim to go to sleep and Petitioner again asked if he could come over to Robert Atkinson's house. The third conversation took place at 1:30 a.m., and Petitioner told Robert Atkinson to come over and that it was urgent with no further explanation.

According to Danny Lake, Petitioner and James Huff came to his house at approximately 9:00 a.m. on October 31. Petitioner had called Danny Lake earlier that morning and told him a body had been found at the school. Petitioner did not indicate that he knew the identity of the victim. However, Robert Atkinson testified that James

Huff came to his house at around 8:30 a.m., without Petitioner, and that James Huff told him a body had been found at the school and that he thought the body might be the victim's. Robert Atkinson stated that James Huff stayed only long enough to pick up the rest of the victim's things.

Bethany Jackson, a friend of the victim, testified that Petitioner called her at 7:00 a.m. on October 31 looking for the victim, saying that she had passed out the night before, that he had left, and that she was gone when he returned. According to Ms. Jackson and other witnesses, Petitioner did not have a car.

Margaret Winegarden, Petitioner's maternal grandmother, stated that Petitioner called her at 10:00 a.m. on October 31 asking to come to her Lakewood residence. She further stated that she had not had much recent contact with Petitioner and that his paternal grandmother, Sondra Weedman, drove Petitioner to her home. Petitioner told Ms. Winegarden that he was concerned about an outstanding warrant from the State of Texas and that a body had been found but he had nothing to do with it. Ms. Winegarden testified that Petitioner had three grocery bags with him containing clothing, books, and cigarettes. Petitioner was arrested at Ms. Winegarden's home that morning. Petitioner was interviewed by detectives that afternoon with his paternal grandparents present and he gave a videotaped statement denying that he had killed the victim.

Petitioner's shoes, which appeared to have blood on them, were taken into evidence along with numerous items from Petitioner's bedroom and those items were subjected to scientific testing by the Colorado Bureau of Investigation ("CBI"). A rape kit also was performed on the victim. One CBI examiner testified that spermatozoa was found in the victim, that Petitioner could not be excluded as the depositor, and that the

blood on Petitioner's shoes was consistent with that of the victim and could have originated from her. Another CBI examiner testified that DNA analysis of the blood on the shoes showed numerous matches with genetic markers present in the victim's blood and that the blood type on the shoes would be found in approximately 1% of one million Caucasians. She also testified that a drop of suspected blood in Petitioner's bathroom sink contained genetic markers that were consistent with both Petitioner and the victim and that she could not conclude that the mix was exclusive to Petitioner and the victim. Test results on bed linen from Petitioner's bedroom indicated the presence of blood that was consistent with Petitioner and did not belong to the victim.

## II.    State Court Proceedings

On November 4, 1996, Petitioner was charged as an adult in Adams County District Court ("the trial court") with first degree murder. In pretrial proceedings, the trial court ruled that Petitioner's videotaped statement was voluntary and admissible, that his request for counsel prior to giving that statement was equivocal, and that evidence of the victim's prior sexual conduct other than that found to be res gestae evidence was inadmissible. On October 24, 1997, after Petitioner's juvenile co-defendant, Aaron Duran, asserted his Fifth Amendment right against self-incrimination, defense counsel objected to the admission of hearsay statements made by the co-defendant. The trial court noted that objection and indicated it would follow applicable case law.

A jury trial was held from October 27 through November 3, 1997. After six days of deliberation, the jury deadlocked and a mistrial was declared. Prior to the retrial, Petitioner retained private counsel to represent him. A second trial was held from February 2 through February 9, 1998. Petitioner was convicted as charged and on

6

February 11, 1998, he was sentenced to life in prison without the possibility of parole. On direct appeal to the Colorado Court of Appeals ("CCA"), the judgment of conviction was affirmed. *See People v. Weedman*, No. 98CA0620 (Colo. Ct. App. Aug. 12, 1999) (unpublished decision) ("*Weedman I*") (Doc. # 27-1, Ex. A). On February 26, 2001, the Colorado Supreme Court denied Petitioner's petition for writ of certiorari on direct appeal. (Doc. #8-3, Ex. C.)

On March 22, 2002, Petitioner filed a *pro se* postconviction motion pursuant to Rule 35(c) of the Colorado Rules of Criminal Procedure. Counsel was appointed to represent Petitioner but withdrew from the case in August 2004 after determining there was no factual basis to support Petitioner's claims. On September 22, 2004, and October 12, 2004, Petitioner filed amended Rule 35(c) motions. On October 27, 2004, the trial court denied the Rule 35(c) motions and the trial court's order was affirmed on appeal. *See People v. Weedman*, No. 04CA2498 (Colo. Ct. App. May 25, 2006) (unpublished decision) ("*Weedman II*") (Doc. # 27-2, Ex. E).

On January 13, 2005, and February 23, 2005, while his appeal in the Rule 35(c) proceedings was pending, Petitioner filed motions for a new trial pursuant to Rule 33 of the Colorado Rules of Criminal Procedure. On May 25, 2005, the trial court denied both Rule 33 motions and subsequently reaffirmed that determination following a limited remand from the CCA. The CCA then affirmed the trial court's order denying the Rule 33 motions. *See People v. Weedman*, No. 05CA1132 (Colo. Ct. App. Feb. 14, 2008) (unpublished decision) (Doc. # 27-3, Ex. F). On May 27, 2008, the Colorado Supreme Court denied Petitioner's petition for writ of certiorari in the postconviction Rule 33 proceedings. (Doc. # 8-8, Ex. H.)

### III.     Federal Court Proceedings

Petitioner claims in the Petition that: (1) his Sixth Amendment right to counsel was violated when the police continued their interrogation after he requested counsel; (2) his right to a fair trial was violated because the jury was shown an unredacted videotape of the police interrogation; (3) his right to a fair trial was violated because he was not allowed to present evidence of alternate suspects; (4) his rights under the Confrontation Clause were violated because the trial court admitted unreliable hearsay statements of a non-testifying co-defendant; (5) the trial court erred in denying his postconviction Rule 33 motions; and (6) counsel was ineffective by failing to adequately investigate exculpatory evidence.

During the initial review of this action, Senior Judge Zita Leeson Weinshienk entered an order (Doc. # 12) on December 22, 2008, dismissing the action as barred by the one-year limitation period in 28 U.S.C. § 2244(d).  On January 14, 2009, Senior Judge Weinshienk entered another order (Doc. #15) granting Petitioner's motion to reconsider, vacating the dismissal order, and reinstating this action.  On April 30, 2009, Senior Judge Weinshienk entered an order (Doc. #20) addressing Respondents' arguments that three of Petitioner's claims are unexhausted.  In the April 30, 2009, order, Senior Judge Weinshienk dismissed Petitioner's unexhausted claim five pursuant to Petitioner's request to dismiss that claim voluntarily and determined that all of Petitioner's remaining claims are exhausted.

### IV.     Legal Standards

The Court must construe the Petition and other papers filed by Petitioner liberally because he is not represented by an attorney.  *See Haines v. Kerner*, 404 U.S. 519,

520 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, the Court should not be an advocate for a *pro se* litigant. *See Hall*, 935 F.2d at 1110.

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Claims of legal error and mixed questions of law and fact are reviewed pursuant to 28 U.S.C. § 2254(d)(1). *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003). The threshold question pursuant to § 2254(d)(1) is whether Petitioner seeks to apply a rule of law that was clearly established by the Supreme Court at the time his conviction became final. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).

If there is no clearly established federal law, that is the end of the Court's inquiry pursuant to § 2254(d)(1). *See id.* at 1018. If a clearly established rule of federal law is implicated, the Court must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law. *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405). "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Williams*, 529 U.S. at 405 (citation omitted).
>
> A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts. *Id.* at 407-08. Additionally, we have recognized that an unreasonable application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply.

*House*, 527 F.3d at 1018.

The Court's inquiry pursuant to the "unreasonable application" clause is an objective inquiry. *See Williams*, 529 U.S. at 409-10. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Id.* at 411. "[A]

decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671. "[O]nly the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Id.*

Claims of factual error are reviewed pursuant to 28 U.S.C. § 2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n.4 (10th Cir. 2002). Section 2254(d)(2) allows the Court to grant a writ of habeas corpus only if the relevant state court decision was based on an unreasonable determination of the facts in light of the evidence presented to that court. Pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct and Petitioner bears the burden of rebutting the presumption by clear and convincing evidence. "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.'" *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

Finally, the Court "owe[s] deference to the state court's *result*, even if its reasoning is not expressly stated." *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999). Therefore, the Court "must uphold the state court's summary decision unless [the Court's] independent review of the record and pertinent federal law persuades [the Court] that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id.* at 1178. "[T]his 'independent review' should be distinguished from a full de novo review of the petitioner's claims." *Id.*

If a claim has not been adjudicated on the merits in state court, and also is not procedurally barred, the Court must review the claim *de novo* and the deferential standards of § 2254(d) do not apply. *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

## V.    Discussion

### A.    Claim One

Petitioner first claims that his Sixth Amendment right to counsel was violated when the police continued their interrogation after he requested counsel. On direct appeal, the CCA accurately described the factual basis for Petitioner's Sixth Amendment claim as follows:

> A police officer testified that, on the afternoon of October 31, 1996, while he was supervising defendant at the police station immediately after his arrest and before questioning by the detectives, defendant asked, "What if I ask for an attorney? . . . Why don't you give me an attorney, um, . . . a lawyer, huh, to speed up the process." The detective stated that he told defendant that he would have to speak to the detective assigned to the case.
>
> One of the two interviewing detectives testified that, prior to defendant's interview later that day, the police officer told him that defendant wanted to "speed up the process" and was requesting a lawyer. The detective stated that he wanted to seek clarification from defendant before honoring his request for an attorney.
>
> Prior to advising defendant of his rights, the following interchange occurred:
>
> > DETECTIVE #1: . . . Okay [defendant], umm, me and you have talked briefly.
> >
> > DEFENDANT: Briefly, okay.

DETECTIVE #1: And um, we've talked briefly about the fact that you were, you had made reference about an attorney?

DEFENDANT:        Yeah.

DETECTIVE #1:  If you wanted to speed up the process that you would try and get an attorney.

DEFENDANT: No.

DETECTIVE #2: Okay before, before we can talk to you we've got to advise you of your rights.

DEFENDANT: All right.

DETECTIVE #2: Okay, you know it's a homicide investigation?

DEFENDANT: Yeah.

DETECTIVE #2: Right.  I think you probably gathered that much.

DEFENDANT: Yeah.

DETECTIVE #2: Okay.  What I would like to do in front of you and your grandparents is give it to you in writing.  It's an advisal of rights.  To make sure we don't violate your rights and all this garbage.  Okay.

The detectives next provided defendant with a standard written advisement form, which defendant signed.

The detectives proceeded and the videotape reveals that they made statements to defendant throughout the interview indicating that the jury would never believe his story, that he would be the youngest person to ever serve on death row, and that his grandparents would be evicted from their home unless he "acted like a man" and admitted that he was involved in the murder.

After forty-five minutes, defendant again asked for an attorney and the detectives stopped the interview. Defendant did not incriminate himself, admit his guilt, or confess to any participation in the murder at any point during the interview.

*Weedman I* at 1-3. Although the trial court determined that Petitioner's initial statements to police regarding counsel were ambiguous, the CCA disagreed.

Here, our review of the record including the videotaped statement does not satisfy us that the defendant's statements regarding representation were equivocal or ambiguous. He referenced his right to a lawyer several times and did not receive adequate responses. Hence, we conclude that defendant's request was sufficiently clear for the detectives to perceive his desire for counsel.

Thus, the trial court's admission of the defendant's statements by the videotape violated defendant's constitutional right to an attorney and constituted error.

*Id*. at 5. Ultimately, the CCA concluded that the error was harmless beyond a reasonable doubt and did not prejudice Petitioner because "[h]e did not confess, incriminate himself, or waver on his claim of innocence." *Id*. at 6.

Before proceeding to the merits of the CCA's decision rejecting Petitioner's Sixth Amendment claim, the Court must address two other preliminary issues raised by the parties. Respondents challenge the CCA's determination that Petitioner's constitutional right to an attorney was violated and they urge the Court to uphold the trial court's ruling that Petitioner's initial request for counsel was ambiguous. The Court declines this invitation and will proceed to review the CCA's harmless error determination. On the other hand, Petitioner argues that the CCA erred in reviewing his Sixth Amendment claim for harmless error because, Petitioner contends, the violation of his constitutional

right to counsel is a structural error that cannot be deemed harmless.  For the reasons discussed below, the Court disagrees.

A structural error "is a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself'" and structural errors occur in only a "very limited class of cases."  *Johnson v. United States*, 520 U.S. 461, 468 (1997) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)).  Errors that have been found to be structural errors include

> the total deprivation of the right to counsel at trial, a biased presiding judge, the systematic exclusion of members of the defendant's own race from a grand jury, the denial of the right to self-representation at trial, the denial of the right to a public trial, the denial of the right to have a district judge (rather than a magistrate judge) preside over jury selection, and a defective reasonable doubt instruction.

*Malicoat v. Mullin*, 426 F.3d 1241, 1250 (10th Cir. 2005).

Most constitutional errors in trial proceedings can be harmless.  *See Fulminante*, 499 U.S. at 306.  The reason for this is that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one."  *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).  "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis."  *Rose v. Clark*, 478 U.S. 570, 579 (1986).

Petitioner does not allege that he was subjected to a complete denial of counsel at trial.  Instead, Petitioner's first claim is based upon a violation of his right to counsel during a police interrogation and the subsequent introduction of a videotape of that interrogation at his trial.  The Court finds that this trial court error is not a structural error and is subject to harmless error review.  *See United States v. Parra*, 2 F.3d 1058, 1068

(10th Cir. 1993) (applying harmless-error review to erroneous introduction of statements made in response to police interrogation after defendant requested counsel). Therefore, the Court will proceed to review the CCA's determination that the violation of Petitioner's constitutional right to counsel was harmless.

"[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard" in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Fry v. Pliler*, 551 U.S. 112, 121 (2007). Pursuant to *Brecht*, a constitutional error does not warrant habeas relief unless the Court concludes it "had substantial and injurious effect" on the jury's verdict. *Brecht*, 507 U.S. at 637. If the evidence is balanced so evenly that the Court is in grave doubt about whether the error meets this standard, the Court must hold that the error is not harmless. *O'Neal v. McAninch*, 513 U.S. 432, 436-37 (1995). The Court makes this harmless error determination based upon a review of the entire state court record. *See Herrera v. Lemaster*, 225 F.3d 1176, 1179 (10th Cir. 2000).

The Court finds that the erroneous introduction of the videotape of Petitioner's statements to police did not have a substantial and injurious effect on the jury's verdict. As noted above, the CCA's conclusion that the error in admitting the videotape was harmless was premised on that court's factual determination that Petitioner "did not confess, incriminate himself, or waver on his claim of innocence." *Weedman I* at 6. The Court presumes this factual determination is correct, *see* 28 U.S.C. § 2254(e)(1), and, in fact, Petitioner does not challenge this determination in any way. In any event, the Court's review of the videotape of Petitioner's interview and the transcript of that interview confirms that the CCA's factual determination is correct.

Petitioner argues in his Traverse, however, that introduction of the videotaped statement "did in fact have a substantial and injurious effect at trial given that the police expressed their opinion as to [Petitioner's] guilt, stated that [Petitioner] has a prior criminal record and was a fugitive, and that they were certain [Petitioner] would not testify at trial." (Doc. # 31 at 6.) Petitioner further argues that "[t]hese statements by the police, as government agents were tantamount to prosecutorial misconduct in that they suggested to the jury that they should find [Petitioner] guilty because the police believed he was guilty." (*Id.*)

The Court is not persuaded by Petitioner's arguments, which were addressed by the CCA in connection with Petitioner's second claim for relief. In that context, the CCA determined that Petitioner was not denied due process based on the fact that the videotaped statement shown to the jury "included the detectives' statements of their opinion of [Petitioner's] guilt, his prior record, his status as a fugitive, and the likelihood that he would not testify at trial." *Weedman I* at 7.

> First, the detectives' statements regarding defend-ant's guilt are merely accusations which are inherent in the charges against him.
>
> Next, because the record reveals that other witnesses had previously testified as to defendant's fugitive status during trial, the detectives' reference to it was simply cumulative.
>
> Finally, the detectives' statement that defendant was not anticipated to testify at trial was a passing reference to the detectives' expectation. Our review of the record satisfies us that the trial court extensively advised the jury that it could not consider defendant's failure to testify as evidence of his guilt.

*Id.* at 8.

Petitioner does not dispute the fact that other witnesses testified he was a fugitive and that there was a Texas juvenile warrant for his arrest. (*See* State Court R., Vol. 7 at 214, 282; Vol. 8 at 36, 54, 59.) In fact, counsel for Petitioner emphasized the fact that Petitioner was a fugitive during closing arguments in an effort to explain that it was reasonable for Petitioner not to contact the police when he allegedly discovered the victim's body and got her blood on his shoes. (*See* State Court R., Vol. 10 at 81-82.) The detective's statement that Petitioner likely would not testify at trial also was merely a passing reference. Furthermore, Petitioner does not dispute the fact that the trial court advised the jury it could not consider his failure to testify as evidence of his guilt. (*See* State Court R., Vol. 10 at 45.) With respect to the detectives' statements that Petitioner was guilty, the Court agrees with the CCA that a statement by a detective during an interview opining that a suspect is guilty is merely an accusation similar to the charges that ultimately may be filed against the suspect. Furthermore, the jury specifically was instructed that the charge against Petitioner was not evidence of guilt. (*See* State Court R., Vol. 10 at 38.)

Therefore, based on the Court's review of the entire state court record, including the Court's review of the videotape of Petitioner's interview and the transcript of that interview, the Court does not find that introduction of Petitioner's videotaped statement taken in violation of his right to counsel had substantial and injurious effect on the jury's verdict. As a result, the Court finds that the CCA's conclusion that the error in introducing Petitioner's videotaped statement at trial was harmless was neither contrary to nor an unreasonable application of clearly established federal law. As a result, Petitioner's first claim for relief will be dismissed.

B.    Claim Two

Petitioner's second claim is related to his first claim.  He alleges in his second claim that his constitutional right to a fair trial was violated because the jury was shown the videotape of the police interrogation without redacting the detectives' improper statements.  Petitioner specifically alleges that showing the jury the complete videotape of his police interrogation was improper because the video essentially consisted of the detectives testifying about Petitioner's lack of credibility.  More specifically, Petitioner alleges that, during the interrogation, the detectives repeatedly stated that Petitioner's story would never be believed, that Petitioner would be the youngest person on death row, that his grandparents would lose their home, and that he needed to act like a man and stand up for what he did.  Petitioner also alleges that the videotape referenced his prior convictions, his status as a fugitive, and a statement that he would not testify at trial.

The CCA applied a plain error standard of review and, as discussed above, rejected Petitioner's claim that introduction of the unredacted videotape violated his right to due process for the following reasons:

> First, the detectives' statements regarding defend-
> ant's guilt are merely accusations which are inherent in the
> charges against him.
>
> Next, because the record reveals that other witnesses
> had previously testified as to defendant's fugitive status
> during trial, the detectives' reference to it was simply
> cumulative.
>
> Finally, the detectives' statement that defendant was
> not anticipated to testify at trial was a passing reference
> to the detectives' expectation.  Our review of the record
> satisfies us that the trial court extensively advised the jury

that it could not consider defendant's failure to testify as
evidence of his guilt.

*Weedman I* at 8.

"[I]t is not the province of a federal habeas court to reexamine state-court
determinations on state-law questions.  In conducting habeas review, a federal court is
limited to deciding whether a conviction violated the Constitution, laws, or treaties of the
United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Therefore, "[h]abeas
relief may not be granted on the basis of state court evidentiary rulings unless they
rendered the trial so fundamentally unfair that a denial of constitutional rights results."
*Mayes v. Gibson*, 210 F.3d 1284, 1293 (10th Cir. 2000); *see also Fox v. Ward*, 200 F.3d
1286, 1296-97 (10th Cir. 2000) (stating that, to justify habeas relief, a trial court's
evidentiary error must be "so grossly prejudicial that it fatally infected the trial and
denied the fundamental fairness that is the essence of due process").

"[B]ecause a fundamental-fairness analysis is not subject to clearly definable
legal elements, when engaged in such an endeavor a federal court must tread gingerly
and exercise considerable self restraint."  *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir.
2002) (internal quotation marks omitted).  The Court's "[i]nquiry into fundamental
unfairness requires examination of the entire proceedings."  *Le v. Mullin*, 311 F.3d 1002,
1013 (10th Cir. 2002) (*per curiam*).

For the same reasons discussed above in the context of Petitioner's first claim,
the Court finds that introduction of the unredacted videotape of Petitioner's interview
did not deny Petitioner a fair trial in violation of his right to due process.  To reiterate,
a number of witnesses testified that Petitioner was a fugitive and Petitioner's status as

a fugitive was an important aspect of defense counsel's explanation of Petitioner's actions after he allegedly discovered the victim's body. Furthermore, the detective's statement that Petitioner likely would not testify at trial was brief and made in passing and the jury was advised that it could not consider Petitioner's failure to testify as evidence of his guilt. Finally, the detectives' statements that Petitioner was guilty and that they did not believe his story are inherent in the fact that Petitioner was charged with and tried for the murder. Therefore, the Court finds that the CCA's rejection of this due process claim was neither contrary to nor an unreasonable application of clearly established federal law. As a result, Petitioner's second claim for relief also will be dismissed.

C.    Claim Three

Petitioner alleges in his third claim that his Fourteenth Amendment right to a fair trial was violated because he was not allowed to present evidence of alternate suspects. Petitioner specifically alleges that he sought to introduce evidence that two other individuals had sexually assaulted the victim approximately one month before her murder and, because they were prosecuted for the sexual assault, could have been responsible for the murder. Although at least one of the individuals was incarcerated at the time of the murder, Petitioner asserts that the alternate suspects still could have been responsible for having the victim killed in retaliation for their own prosecutions.

The CCA rejected Petitioner's claim that he should have been allowed to present evidence of alternate suspects because, under Colorado law, "[t]o present evidence of alternate suspects, a defendant must first offer proof directly connecting an alternative suspect with the crime." *Weedman I* at 9. The CCA concluded, as did the trial court,

21

that Petitioner failed to present an adequate foundation that would implicate the alternate suspects in the murder. Because Petitioner's third claim was not adjudicated on the merits as a federal constitutional claim by the state courts, the Court must review the claim *de novo*. *See Gipson*, 376 F.3d at 1196.

The parties agree that clearly established Supreme Court decisions provide states with broad latitude under the Constitution to establish rules excluding evidence from criminal trials. *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). Of course, this broad latitude is limited by the constitutional guarantee that criminal defendants have "a meaningful opportunity to present a complete defense." *Id.* (internal quotation marks omitted).

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

*Id.* at 326. Consistent with these constitutional principles, evidentiary rules regulating admission of alternate suspect evidence are widely accepted. *Id.* at 327.

Two portions of the state court record are particularly relevant to the Court's consideration of Petitioner's third claim. First, volume three of the state court record is the transcript of an October 21, 1997, pretrial hearing on Petitioner's motion to permit testimony relating to evidence of prior sexual activity of the victim in order to show that the murder was committed by someone other than Petitioner. The trial court denied that motion at the conclusion of the hearing. Second, at trial, counsel for Petitioner filed a

motion to reconsider the trial court's pretrial ruling and the motion to reconsider was argued and denied on the morning of the third day of trial. (*See* State Court R., Vol. 8 at 4-6.)

The only conclusion the Court can reach based on the state court record is that the trial court's rulings disallowing speculative evidence of alternate suspects did not render Petitioner's trial fundamentally unfair. The Court agrees with the trial court and the CCA that the alternate suspect evidence Petitioner sought to introduce demonstrated only the existence of a possible motive by the individuals who sexually assaulted the victim approximately one month before she was killed. The possible motive was the fact that the alternate suspects were prosecuted for sexually assaulting the victim. However, although the alternate suspects had lived in the same foster home as Petitioner's co-defendant, one of those individuals was incarcerated at the time of the murder and the other was living in a different foster home in Parker, Colorado. Petitioner simply failed to present any evidence that linked the alternate suspects to the actual murder in any way.

For these reasons, the Court finds that evidence of the prior sexual assaults properly was disallowed. "Evidence that tends to prove a person other than the defendant committed a crime is relevant, but there must be evidence that there is a connection between the other perpetrators and the crime, not mere speculation on the part of the defendant." *DiBenedetto v. Hall*, 272 F.3d 1, 8 (1st Cir. 2001). In particular, the Court finds that the evidence of prior sexual assaults that Petitioner sought to introduce, which was not linked to the actual murder in any way, could only have confused the issues and mislead the jury. *See Wade v. Mantello*, 333 F.3d 51, 62

23

(2d Cir. 2003) (finding that exclusion of alternate suspect evidence did not violate the Constitution "[i]n light of the limited relevance of the proposed testimony and the substantial countervailing dangers it posed"); *DiBenedetto*, 272 F.3d at 8-9 (finding that exclusion of alternate suspect evidence did not violate the Constitution because the proposed evidence was speculative, would disparage the victims as bad people, and posed a real danger of distracting the jury from the case at trial).  Therefore, the Court concludes that Petitioner's constitutional right to present a defense was not violated and his third claim must be dismissed.

### D.    Claim Four

Petitioner asserts in his fourth claim that his rights under the Confrontation Clause were violated because the trial court admitted unreliable hearsay statements of his non-testifying co-defendant Aaron Duran.  Petitioner alleges that, although Aaron Duran exercised his Fifth Amendment rights and did not testify at Petitioner's trial, statements made by Aaron Duran implicating himself and Petitioner in the murder were introduced at trial through other witnesses.  Petitioner maintains that Aaron Duran's statements were not reliable and should not have been admitted into evidence.

The Court notes initially that Aaron Duran made a number of statements that were admitted at Petitioner's trial through other witnesses.  Those statements included Aaron Duran's non-custodial statements to other juvenile witnesses (*see* State Court R., vol. 8 at 89-100, 131-34, 159-65) as well as his custodial statements to police officers (*see* State Court R., vol. 9 at 73-80, 101-03).  Petitioner does not specify in the Petition whether he is challenging in his fourth claim the introduction of Aaron Duran's non-custodial statements, his custodial statements, or both.  However, the Court notes that

24

the Confrontation Clause issue arose with respect to Aaron Duran's non-custodial statements to other juvenile witnesses and not his statements to the police. (*See* State Court R., vol. 5 at 20.) Furthermore, when Petitioner raised the Confrontation Clause issue in his direct appeal he challenged only the introduction of Aaron Duran's non-custodial hearsay statements to other juvenile witnesses and not the introduction of his custodial statements to the police. (*See* Doc. # 17-1, Ex. K at pp.27-29.) Therefore, the Court construes Petitioner's fourth claim as challenging only the introduction at trial of Aaron Duran's non-custodial hearsay statements to other juvenile witnesses.

At Petitioner's first trial, the trial court held a hearing and admitted Aaron Duran's non-custodial statements pursuant to Rule 804(b)(3) of the Colorado Rules of Evidence as statements against penal interest, an exception to the general rule excluding hearsay evidence. (*See* State Court R., vol. 5 at 20.) The trial court specifically determined that the statements were admissible under state and federal law because Aaron Duran was unavailable as a witness after he exercised his Fifth Amendment right to remain silent, the statements were against Aaron Duran's penal interests, and corroborating circumstances existed that indicated the statements were trustworthy. (*Id.* at 15-20.) "Prior to the second trial, [Aaron Duran] again exercised his right to remain silent. During this trial, [Petitioner] renewed his objections to the admission of the hearsay statements. The trial court overruled his objections, concluding that the statements were admissible as statements against penal interest, pursuant to CRE 804." *Weedman I* at 10-11.

The CCA agreed that Aaron Duran's non-custodial statements properly were admitted pursuant to Rule 804(b)(3) and also concluded that Petitioner's right to

confront the witnesses against him was not violated.  The CCA reasoned as follows with respect to the these issues:

> *People v. Newton, supra*, sets forth a three-part test for the admission of CRE 803(b)(3) [sic] statements that inculpate a defendant: (1) the witness must be unavailable; (2) the statement must tend to subject the declarant to criminal liability; and (3) the state must show by a preponderance of evidence that corroborating circumstances demonstrate the trustworthiness of the statement.  In step three, the court should rely only on the circumstances surrounding the making of the statement.  Fulfillment of this test satisfies the confrontation clause.
>
> Here, because the co-defendant was unavailable and his statements inculpated himself, steps one and two of the Newton test are clearly satisfied.  Testimony was introduced regarding the circumstances surrounding each of the co-defendant's hearsay statements.  The co-defendant asked two witnesses to promise not to tell anyone about his statements, and then told them about the murder and related motives for the crime.  While the co-defendant was watching the news about the murder with a third witness, she asked him if he knew the victim, and he voluntarily stated that he and [Petitioner] had killed her.  The court also noted that when the co-defendant made his statement to the police, in which he inculpated himself and defendant, he did not try to deflect blame from himself onto [Petitioner].
>
> Under these circumstances, we conclude that the trial court adequately considered all three parts of the *Newton* test, and thus, we perceive no error in the admission of the co-defendant's statements.

*Weedman I* at 12-13.

The right of an accused to confront the witnesses against him is guaranteed by the Sixth Amendment to the United States Constitution and applies in both federal and state prosecutions.  *See Stevens v. Ortiz*, 465 F.3d 1229, 1235 (10th Cir. 2006).  "The central concern of the Confrontation Clause is to ensure the reliability of the evidence

against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).  As a result, "an out-of-court statement that falls within an exception to a hearsay rule under a state's evidentiary rules must nonetheless be excluded from a defendant's trial if its admission would deprive him of his constitutional right of confrontation."  *Stevens*, 465 F.3d at 1236 (citing *Dutton v. Evans*, 400 U.S. 74 (1970)).

Prior to the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), admission of a hearsay statement did not violate the Confrontation Clause if the declarant was unavailable to testify and the statement bore "adequate 'indicia of reliability.'"  *Ohio v. Roberts*, 448 U.S. 56, 66 (1980).  The reliability of a hearsay statement could either be inferred from the fact that the statement fell "within a firmly rooted hearsay exception" or established by "a showing of particularized guarantees of trustworthiness."  *Id.*  Consistent with the standard announced in *Roberts* that was the established Supreme Court law at the time of his trial, Petitioner challenges the introduction of Aaron Duran's non-custodial hearsay statements to other juvenile witnesses on the grounds that those statements were not reliable.

In *Crawford*, the Supreme Court criticized the *Roberts* standard as both underinclusive and overinclusive.  *See United States v. Smalls*, – F.3d –, 2010 WL 1745123 at *5 (10th Cir. May 3, 2010).

> The standard was underinclusive or too narrow because it failed to exclude the admission of all ex parte testimonial statements, and thus "failed to protect against paradigmatic confrontation violations."  *Crawford*, 541 U.S. at 60.  The standard was overinclusive or too broad because it required "close constitutional scrutiny" of nontestimonial hearsay "far removed from the core concerns of the Clause."  *Id.*

27

> Crawford resolved the problem of underinclusiveness by
> holding the Confrontation Clause constituted an absolute bar
> to the admissibility of a testimonial hearsay statement where
> the declarant was unavailable to testify at trial and the
> defendant had no prior opportunity to cross-examine the
> declarant. *Id.* at 59. For the time being, however, the Court
> declined to "definitively resolve" the problem of overinclu-
> siveness, namely the issue of whether the Confrontation
> Clause left the admissibility of nontestimonial statements
> solely to the law of hearsay. *Id.* at 61.

*Smalls*, 2010 WL 1745123 at *5. Although the Supreme Court in *Crawford* declined to

provide an exhaustive list of what types of statements were testimonial, it noted that

testimonial statements typically involve "a solemn declaration or affirmation made for

the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51 (internal

quotation marks and alteration omitted). At a minimum, testimonial statements include

"prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to

police interrogations." *Id.* at 68.

Two years after *Crawford*, the Supreme Court addressed the problem of

overinclusiveness in the *Roberts* standard and held that the Confrontation Clause

excludes only testimonial hearsay statements and has no application to non-testimonial

hearsay statements. *Davis v. Washington*, 547 U.S. 813 (2006). As the Supreme Court

has made clear, "[i]t is the testimonial character of the statement that separates it from

other hearsay that, while subject to traditional limitations upon hearsay evidence, is not

subject to the Confrontation Clause." *Id.* at 821. Following *Crawford* and *Davis*, the

*Roberts* standard, which requires either a firmly rooted hearsay exception or

particularized guarantees of trustworthiness, no longer is good law and has been

rendered academic. *See Smalls*, 2010 WL 1745123 at *6.

As discussed above, Petitioner's fourth claim challenges only the introduction at trial of Aaron Duran's non-custodial hearsay statements to other juvenile witnesses. The statements in question clearly are non-testimonial statements because "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford*, 541 U.S. at 51; *see also Garrison v. Ortiz*, 296 F. App'x 724, 726 (10th Cir. 2008) (concluding that out-of-court statements made informally to an acquaintance that did not seek to prove facts relevant to a criminal investigation could not be deemed testimonial). As a result, under *Crawford* and *Davis*, those statements fall outside the scope of the Confrontation Clause and Petitioner's fourth claim clearly lacks merit. The issue then, is whether the Court may consider the Supreme Court's decisions in *Crawford* and *Davis*, or whether the Court must decide only whether the CCA's decision is contrary to or an unreasonable application of *Roberts*.

Petitioner's conviction became final in 2001, before *Crawford* and *Davis* had been decided. As a result, the CCA analyzed Petitioner's Confrontation Clause claim on direct appeal using a standard consistent with the *Roberts* standard and concluded that admission of Aaron Duran's non-custodial hearsay statements to other juvenile witnesses did not violate the Confrontation Clause because Aaron Duran was unavailable to testify and corroborating circumstances existed that demonstrated his statements were trustworthy. As noted above, Petitioner argues that his rights under the Confrontation Clause were violated because Aaron Duran's non-custodial statements were not reliable. Respondents also address Petitioner's fourth claim in the context of a reliability analysis consistent with *Roberts*. However, the Court concludes

that, even assuming the CCA's decision was an unreasonable application of *Roberts*,

Petitioner's Confrontation Clause claim must be dismissed because he cannot

demonstrate that he is in custody in violation of his constitutional rights.

The Court's legal research has not led to the discovery of any Supreme Court or

Tenth Circuit precedent that controls the outcome of this issue. However, the Court is

persuaded by the reasoning of a Sixth Circuit decision that addressed the same issue

and concluded that "a habeas applicant [may not] obtain relief on the basis of a state

court's allegedly unreasonable application of a Supreme Court precedent (*Roberts*)

that no longer is good law (*see Crawford/Davis*)."  *Desai v. Booker*, 538 F.3d 424, 427

(6th Cir. 2008).

The Confrontation Clause issue in *Desai* was very similar to the issue in the

instant case. Desai was convicted of first degree murder for allegedly hiring another

person, Adams, to kill Desai's business partner. *See id.* at 426. Desai and Adams were

tried jointly before separate juries and the evidence introduced at trial included a

statement Adams made to an acquaintance confessing to the murder. *See id.*

Desai claimed in federal habeas corpus proceedings that admission of Adams' non-

testimonial hearsay statement violated his rights under the Confrontation Clause. *See*

*id.* at 427. Although Desai conceded that the Confrontation Clause no longer applied to

the non-testimonial statement he was challenging, he argued that *Davis* should not be

applied retroactively to defeat his claim. *See id.* at 425-26.

The Sixth Circuit gave several reasons for its conclusion that Desai could not rely

on *Roberts* to obtain habeas relief. "*First*, before and since the passage of AEDPA, the

point of the great writ has been to release individuals from custody or other equivalent

consequences of a conviction because they are currently being held in violation of their constitutional rights." *Id.* at 427-28; *see* 28 U.S.C. § 2254(a) (providing that a federal court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court only on the grounds that he is in custody in violation of the Constitution or laws of the United States"). Thus, the Sixth Circuit reasoned, it is clear that § 2254 relief "is available only to state prisoners who currently are being held in violation of an existing constitutional right, not to inmates who at one point might have been able to show that a since-overruled Supreme Court or lower court precedent would have granted them relief." *Desai*, 538 F.3d at 428.

The second reason on which the Sixth Circuit relied is that, "as a practical matter, correcting violations of extant constitutional standards is all that the statute ever could meaningfully require of a State-at least when it comes to a constitutional challenge to the admission of evidence." *Id.* In other words, even if Petitioner could demonstrate that his rights under *Roberts* were violated, the most he could hope for would be a new trial at which Aaron Duran's non-testimonial hearsay statements again would be admitted consistent with the Supreme Court's ruling in *Davis* that the Confrontation Clause does not apply to non-testimonial hearsay statements.

The Sixth Circuit next rejected Desai's argument that a habeas petitioner is entitled to relief pursuant to 28 U.S.C. § 2254(d) as long as he can show that the state courts unreasonably applied a Supreme Court decision. *See id.* According to the Sixth Circuit, an unreasonable application of clearly established federal law is a necessary, but not sufficient, condition for habeas corpus relief because "[s]ection 2254(a) still

requires the applicant to show that he is currently being held in custody in violation of an extant constitutional right." *Id.* at 429.

Finally, the Sixth Circuit addressed the non-retroactivity principle in *Teague v. Lane*, 489 U.S. 288 (1989). "Under *Teague*, federal courts will respect 'reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions.'" *Desai*, 538 F.3d at 429 (quoting *Butler v. McKellar*, 494 U.S. 407, 414 (1990)). The Sixth Circuit reasoned that *Teague* did not prevent consideration of the Supreme Court's ruling in *Davis* to reject Desai's Confrontation Clause claim because

> *Teague* – premised on finality, comity and federalism concerns – *restricted* the kinds of theories upon which habeas applicants could rely in challenging final state-court decisions; it did not purport to announce new gateways for bringing habeas claims. The central basis for *Teague* – respect for state-court convictions when the state courts had no reason to anticipate the Supreme Court's later creation of a new constitutional rule – does not extend to a habeas applicant's efforts to overturn a state-court conviction that is later proved *correct*, albeit for different reasons.

*Id.* The Sixth Circuit also relied on the fact that the Supreme Court, in *Lockhart v. Fretwell*, 506 U.S. 364 (1993), determined it was not inconsistent with *Teague* to consider subsequent decisions that undercut the precedents on which a habeas petitioner relied because "'the state will benefit from our *Teague* decision in some federal habeas cases, while the habeas petitioner will not.'" *See id.* (quoting *Lockhart*, 506 U.S. at 373.

The Court is persuaded by the Sixth Circuit's reasoning in *Desai*. Therefore, the Court finds that Petitioner's fourth claim for relief lacks merit because, under *Davis*,

Petitioner cannot demonstrate he is in custody in violation of his constitutional rights.

Petitioner's fourth claim for relief will be dismissed because the introduction of Aaron

Duran's non-testimonial hearsay statements does not implicate the Sixth Amendment's

Confrontation Clause.  *See Davis*, 547 U.S. at 821.

　　　E.  Claim Six

　　　Petitioner finally claims that counsel was ineffective by failing to adequately

investigate exculpatory evidence.  Petitioner specifically alleges that a private

investigator wrote a letter to Petitioner's public defender on December 12, 1996,[2]

indicating that Petitioner's grandparents had exculpatory evidence that would exonerate

Petitioner and counsel failed to investigate or present this evidence to the jury.  The

CCA described the factual basis for this claim as follows:

> Defendant contends that trial counsel was ineffective
> because he failed to investigate a witness and introduce
> potentially exculpatory testimony by the witness.
> Specifically, defendant contends that his counsel was in
> possession of an investigator's report of a witness who
> would have exonerated defendant by testifying he had been
> told by another person that someone else committed the
> crime, and that counsel failed to investigate or call the
> witness at trial.

*Weedman II* at 7.  The CCA went on to explain that

> defendant bases his contention on a document, also not in
> the record, which apparently is the first page of a letter
> written to his public defender, and which alleges that
> defendant's grandparents stated that B.D. was told by his
> son W.D. that W.D. had been told by someone else that
> D.L., another teenager, had held the victim while the co-

---

[2] Petitioner alleges in the Petition that the letter from the private investigator was dated December
9, 1997.  However, the letter in question, a copy of which was attached to Petitioner's March 22, 2002,
postconviction Rule 35(c) motion, bears the date December 12, 1996.  (*See* State Court R., vol. 1 at 199-
200.)

> defendant stabbed her. Defendant contends that defense
> counsel, by which he appears to mean his private counsel
> hired a year later, had this letter but did not investigate the
> information in it or call W.D. as a witness. However,
> defendant does not allege any factual support for his
> contention that his private counsel was in possession of the
> letter.

*Id.* at 8.

It was clearly established when Petitioner was convicted that a defendant has a

right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668

(1984). To establish that counsel was ineffective, Petitioner must demonstrate both that

counsel's performance fell below an objective standard of reasonableness and that

counsel's deficient performance resulted in prejudice to his defense. *See id.* at 687.

"Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

There is "a strong presumption" that counsel's performance falls within the range of

"reasonable professional assistance." *Id.* It is Petitioner's burden to overcome this

presumption by showing that the alleged errors were not sound strategy under the

circumstances. *See id.* "For counsel's performance to be constitutionally ineffective, it

must have been completely unreasonable, not merely wrong." *Boyd v. Ward*, 179 F.3d

904, 914 (10th Cir. 1999).

Under the prejudice prong, Petitioner must establish "a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Id.* In determining whether

Petitioner has established prejudice, the Court must look at the totality of the evidence

presented at trial and not just the evidence that is helpful to Petitioner.  *See Boyd*, 179

F.3d at 914.

Finally, ineffective assistance of counsel claims are mixed questions of law and

fact.  *See Strickland*, 466 U.S. at 698.  Conclusory allegations that counsel was

ineffective are not sufficient to warrant habeas relief.  *See Humphreys v. Gibson*, 261

F.3d 1016, 1022 n.2 (10th Cir. 2001).  If Petitioner fails to satisfy either prong of the

*Strickland* test, the ineffective assistance of counsel claim must be dismissed.  *See*

*Strickland*, 466 U.S. at 697.

The CCA applied the proper *Strickland* standards and rejected Petitioner's

ineffective assistance of counsel claim because Petitioner did not suffer any prejudice

from counsel's alleged failure to investigate.

> At trial, defense counsel elicited hearsay statements made
> by the co-defendant to a police officer to the effect that D.L.
> had stabbed the victim, and D.L. was cross-examined on this
> point by defense counsel.  Thus, the hearsay evidence in the
> letter, even if admitted at trial, would have been cumulative.
> Accordingly, as a matter of law, defendant's allegations do
> not satisfy the prejudice prong of the Strickland test.

*Weedman II* at 9.

The CCA's determination that Petitioner did not establish prejudice under

*Strickland* is not contrary to or an unreasonable application of clearly established federal

law.  Based on the Court's review of the state court record and the totality of the

evidence at Petitioner's trial, Petitioner cannot demonstrate a reasonable probability that

he would not have been convicted if counsel had investigated and presented to the jury

the hearsay evidence that Danny Lake, referred to as D.L., had committed the murder

with Petitioner's co-defendant Aaron Duran.  As discussed by the CCA, defense

counsel elicited testimony from a police officer concerning Aaron Duran's hearsay statements that implicated Danny Lake in the murder (*see* State Court R., vol. 9 at 77-80) and defense counsel also cross-examined Danny Lake about his possible involvement in the murder (*see* State Court R., vol. 7 at 281). As a result, the Court agrees that introduction of the hearsay evidence outlined in the private investigator's December 1996 letter would have been cumulative and the failure to introduce that evidence did not prejudice Petitioner because it would not have altered the outcome of his trial. Therefore, Petitioner's sixth claim also lacks merit and will be dismissed.

Accordingly, it is ORDERED that

1.      Petitioner Christopher Weedman's Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus ("Petition") (Doc. # 4) is DENIED.

2.      This case is DISMISSED WITH PREJUDICE.

3.      There is no basis on which to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c).

        DATED at Denver, Colorado, this __23rd__ day of __June__, 2010.

                                        BY THE COURT:

                                        _____
                                        CHRISTINE M. ARGUELLO
                                        United States District Judge